**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | | |
|---|---|---|
| CINCINNATI INSURANCE CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 4:12-CV-01484-NKL |
| v. | ) | |
| | ) | |
| THE MISSOURI HIGHWAYS AND | ) | |
| TRANSPORTATION COMMISSION, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

Pending before the Court are the cross motions for summary judgment of Plaintiff

Cincinnati Insurance Company and Defendants Missouri Highways and Transportation

Commission (MHTC), *et al.* Docs. 113 and 125. For the reasons set forth below,

Cincinnati's motion is denied, and MHTC's motion is granted in part and denied in part.

**I.      Undisputed Facts[1]**

This case principally concerns whether coverage exists for a judgment entered

against MHTC in the Circuit Court for Clay County, Missouri, under an insurance policy

that Cincinnati issued to Norris Asphalt Paving Company. The underlying state court

action arose from a June 24, 2001 single-car accident that occurred on a northbound

portion of Interstate 29 (I-29), Doc. 126-33 at 4, near its intersection with Missouri Route

W, in Holt County, Missouri, Doc. 126-5 at 6. Three persons were killed in the accident

---

[1]      While the parties have denied their opponents' facts by trying to limit them
to the inference each prefers, some facts are clearly undisputed.

and four others were injured. Doc. 126-33 at 4. This accident was ultimately determined

to have been caused in part by a dangerous and defective condition on the highway,

specifically an edge drop-off and rutting on the shoulder. Doc. 126-33 at 6.

A.    Norris' Contract with MHTC and Insurance Policy with Cincinnati

At the time of the accident at issue in the Clay County suit, Norris was under

contract with MHTC to perform certain repairs and resurfacing on a 7.071 mile portion of

I-29 that included the site of the accident. Doc. 127 at 6-7. Norris was to perform some

of the work on its own, but Norris also engaged a number of other road construction

companies and contractors to help complete the project. Doc. 127 at 6-7. Pursuant to the

construction contract, the work was generally to be done "in accordance with the

'Missouri Highways and Transportation Commission Standard Specifications for

Highway Construction 1999 [the Standard Specifications]," which were incorporated into

the agreement. Doc. 126-3 at 28.

Under section 107.13.2.1 of the Standard Specifications, Norris was required to

obtain an occurrence-based policy of commercial general liability insurance that would

provide coverage for the contract work. Doc. 127-7 at 4. Section 107.13.2.3 further

provided, "Each such policy of commercial general liability insurance shall name the

State of Missouri for the benefit of its State Legal Expense Fund, the Commission, and its

members, agents and employees, as additional insureds . . . The insurance afforded by the

contractor shall be primary insurance." *Id.*

The insurance policy that Cincinnati issued to Norris, which is the subject of this

suit, contained the following endorsement titled, "AUTOMATIC ADDITIONAL

INSURED—WHEN REQUIRED IN CONTRACT OR AGREEMENT WITH YOU":

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

1. WHO IS AN INSURED (Section II) is amended to include as an insured:

    2e. Any person or organization, hereinafter referred to as ADDITIONAL INSURED, for whom you are required to add as an additional insured on this Coverage Part under:

    (1) A written contract or agreement; or

    (2) An oral agreement or contract where a certificate of insurance showing that person or organization as an additional insured has been issued;

    but only with respect to liability arising out of your ongoing operations performed for that additional insured by you or on your behalf. A person's or organization's status as an insured under this endorsement ends when your operations for that insured are completed.

    ***

4. COVERAGES (Section I) is amended to include:

    The insurance provided to the additional insured does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" arising out of the:

    ***

    b. Sole negligence or willful misconduct of, or for defects in design furnished by, the additional insured or its "employees"[.]

Doc. 126-37 at 27.

**B.      The Clay County Suit and Cincinnati's Refusal to Provide MHTC a
Defense**

The original petition for wrongful death and personal injury filed by the plaintiffs

in the Clay County suit[2] on January 6, 2003 did not name Norris as a defendant or

mention Norris by name.  *See* Doc.  126-2.  At that time, the named defendants consisted

of the driver of the vehicle, the State of Missouri d/b/a the Missouri Department of

Transportation, and the Commissioners of the Missouri Department of Transportation.

Doc. 126-2 at 2.  The Clay County plaintiffs initially alleged that "[t]he State of Missouri,

through MoDOT [MHTC], had a duty to maintain the road, including the shoulder, in a

reasonable and proper manner," and that the "State of Missouri and MoDOT, through the

employees and agents of MoDOT were negligent in the maintenance of the aforesaid

road rendering it a dangerous and defective condition of State property."  Doc. 126-2 at

4-5.  The plaintiffs further alleged that the driver of the vehicle negligently operated the

---

[2]         There were actually two suits filed in the Circuit Court of Clay County
concerning the subject accident.  One was brought by Wei Sen, *pro se*, for the wrongful
death of her son, Kai Chow Tsui.  Doc.  126-4 at 3.  Another was brought by Yuk C.
Chan, Xiang Lin, Yun Chow Liu a/k/a Yuna Chow, May Cho, and Ying Chow,
represented by the same counsel who represent all of the defendants in the present case,
for all of the other injuries and deaths.  Doc.  126-2 at 2, 13-14.  Defendants in this case
include all six of the Clay County plaintiffs, and Yuk I. Tsui a/k/a Robert Chow, who was
the driver of the vehicle and a defendant in the Clay County suit, as well as the MHTC.
Although it is not clear whether these cases were ever formally consolidated, the final
judgment in the Clay County suit resolved the claims of all of these plaintiffs as against
MHTC.  *Compare* Docs. 126-4 at 1, 3 and 126-2 at 2, *with* Doc. 126-33 at 6-7.
        While there are some variations between the original and amended petitions filed
by the respective plaintiffs, there are no differences that are material to the resolution of
the present motions.  Accordingly, the Court will refer to the plaintiffs in the Clay County
actions collectively, as though there is only one underlying case, while recognizing that
the plaintiffs did not all originally join in the same petition for damages.

vehicle and that this negligence combined with "the dangerous and defective State Property" caused the accident and resulting injuries and deaths. Doc. 126-2 at 6.

On May 5, 2004, counsel for MHTC in the Clay County suit sent a letter to Brady Meldrem, President of Norris, tendering the defense of this lawsuit to Norris and recommending that Meldrem immediately forward the demand to his insurance carrier. Doc. 126-6 at 1. As cause, counsel for MHTC wrote, "We believe that the contract for the subject [construction] project requires that Norris . . . defend and indemnify MHTC in this matter." Doc. 126-6 at 1. This letter was directed to Norris because MHTC had not yet been able to identify Norris' insurance carrier. Doc. 126-39 at 13, 18. There is no evidence that Norris or Cincinnati responded in writing to this letter, but MHTC's counsel and Meldrem did speak on the phone regarding the matter. Doc. 126-39 at 18-19, 144.

On May 12, 2004, MHTC's counsel sent another letter to Meldrem as a follow-up to the phone conversation, stating, "Per our telephone conversation, I have provided you background information regarding the case and have enclosed some materials that will further explain our position." Doc. 126-7 at 1. This letter provided a summary of the claims and allegations in the underlying case, including the plaintiffs' claim that an "edge rut" on the shoulder of the highway caused the driver to lose control of his vehicle. Doc. 126-7 at 1-2. MHTC's counsel further remarked, "While there is evidence of some drop off, the Highway Patrol report indicates driver error to be the main cause of the accident." Doc. 126-7 at 2.

Regarding the basis for MHTC's tender of defense, MHTC's position was, at that time, described as follows:

>As I stated to you on the phone, this accident occurred when this portion of I-29 was under Norris Asphalt Paving Co.'s control in conjunction with Job No. J1I0733. In the Contract and Bond signed by both Norris Asphalt and the Missouri Highways and Transportation Commission, Norris Asphalt agreed to comply with the contract provisions laid out in the "Missouri Standard Specifications for Highway Construction, 1999" and "Missouri Standard Plans for Highway Construction." In the Missouri Standard Specifications for Highway Construction, 1999, Sections 107.11 and 107.13.2.3 govern Norris Asphalt's responsibility for claims for damage and injury, and the insurance coverage required for such claims. For your convenience, copies of these portions have been enclosed with this letter. As you will see, Norris Asphalt is required to indemnify and save harmless the State of Missouri, the Commission, its agents, and employees from all claims or suits made or brought for personal injury, death or property damage, caused or contributed to be caused by the creation or maintenance of a dangerous condition of or on the Commission's property or right of way, which condition at least occurred in part due to the acts or omissions of the contractor, subcontractors or suppliers. Norris Asphalt was in possession and control of the roadway at issue in this lawsuit and, therefore, was responsible for any maintenance or repairs of such roadway. Further, Norris Asphalt was required to name the State of Missouri, the Highway Commission, its agents, members, and employees as additional insureds under its commercial general liability policy.

Doc. 126-7 at 2. In addition to the selections from the Standard Specifications, several photographs of the accident site were enclosed with this letter. Docs. 126-7 at 2-7; 126-39 at 19-20.

Sometime after sending this letter, MHTC was able to identify Cincinnati as Norris' insurance carrier. Theresa Otto, an attorney for MHTC in the underlying suit,

testified that they received a phone call from counsel for Cincinnati on May 14, 2004.
Doc. 126-39 at 21-22. Billing records from MHTC's counsel in the Clay County suit
also document a "[p]hone call with Norris Asphalt's insurance broker," and a "[p]hone
conversation with Cincinnati Insurance regarding tender of defense," on May 14 and 28,
2004, respectively. Doc. 126-39 at 144-45. On May 14, Cincinnati's counsel reported
having received from Norris the May 5 and May 12 letters from MHTC, along with the
enclosures, requested no additional information, and stated that he was evaluating the
tender of defense. Doc. 126-39 at 22-23.

On June 14 and 23, 2004, the Clay County plaintiffs amended their petitions to
name Norris as a defendant and include certain allegations specific to Norris. Docs. 126-
4; 126-5. The amended petitions set forth the following allegations against Norris:

> 24. From November 8, 2000 to May 28, 2003 [Norris] was
> under contract with defendant MoDOT to perform
> construction and maintenance on Interstate 29, . . . . Entitled
> Job J1I0733, [Norris] was responsible under the contract for
> the following construction and maintenance: resurface with
> superpave, pavement repair, guardrail replacement,
> deceleration lane extension, and bridge rehabilitation.
>
> 25. [Norris] began work on the aforementioned construction
> and maintenance on March 15, 2001 and completed the work
> on March 28, 2003. The final inspection date was March 28,
> 2003.
>
> 26. At all times relevant herein, [Norris] was contractually
> obligated to complete the construction and maintenance in
> accordance with the "Missouri Highways and Transportation
> Commission Standard Specifications for Highway
> Construction 1999."

***

32.  Interstate 29 is a primary road, and at the location of the incident I-29 was under the jurisdiction of both Defendant MoDOT and [Norris].

33.  The location of the incident was within the area of construction and maintenance delineated in Job J1I0733 contracted by defendant MoDOT with [Norris].

34.  The State of Missouri, through MoDOT, had a duty to maintain the road, including the shoulder, in a reasonable and proper manner to keep the road and its shoulder reasonably save for travel by the public.

35.  Defendants State of Missouri and MoDOT, through the above named defendant employees and agents of MoDOT were negligent in the inspection, maintenance, and repair of the aforesaid road rendering it a dangerous and defective condition.

36.  [Norris] was negligent in the construction and maintenance of the aforesaid road rendering it a dangerous and defective condition of State property in that it:

    a.  Failed to perform the construction and maintenance delineated under Job J1I0733 in a timely manner, rendering it a dangerous condition to the traveling public;

    b.  Failed to adequately mark the construction area with signage to alert the traveling public of the unsafe condition of the roadway;

    c.  Failed to inspect, maintain, and timely and adequately repair the dangerous and defective condition of the subject roadway even though the defendant MoDOT had delegated such duties and responsibilities to [Norris]; and

    d.  Failed to warn and adequately warn and/or guard the public from such dangerous and defective condition as plead herein, including warning and guarding the plaintiffs and defendant Chow from such dangerous and

> defective condition by the placement of warning
> signs, limited access to the right shoulder, and
> limited usage of the right lane due to such
> dangerous and defective conditions as described
> above of the right hand shoulder.
>
> ***
>
> 42. The aforesaid negligence of Defendant Tsui (Chow) and
> the negligence of defendants MoDOT, [and] Norris Asphalt
> Paving Company, . . . rendered State Property dangerous and
> defective and were the direct, proximate and several causes of
> the incident, injuries, loss of life, and damages to the
> Plaintiffs as described herein.

Doc. 126-5 at 6-8, 10-11; *see also* Doc. 126-4 at 5-9.

On October 2, 2006, counsel for MHTC and counsel for Norris in the underlying suit, Joseph Roper, met to discuss the Clay County suit. Doc. 126-39 at 26. During this meeting, MHTC's counsel asked Roper if he would agree to forward correspondence from MHTC to Cincinnati, as they had not received any response from Cincinnati regarding the tender and Roper had a relationship with Cincinnati. Doc. 126-39 at 25-26. On October 4, 2006, MHTC renewed its tender of defense to Cincinnati via a letter sent to Roper. Docs. 126-8 at 1; 126-39 at 25-26.

The October 4 letter did not indicate that an amended petition had been filed in the Clay County action, but it did state that Norris had been named as a defendant in that case. Doc. 126-8 at 1. This letter summarized the plaintiffs' claims and MHTC's position as follows:

> Plaintiffs claim that the State of Missouri and Norris Asphalt
> had a duty to maintain the road, including the shoulder, in a
> reasonable and proper manner to keep the road and its
> shoulder reasonably safe for travel by the public.

As I stated at our meeting, this accident occurred on a portion of I-29 that was under Norris Asphalt Paving Co.'s control in conjunction with Job No. J1I0733. It is MHTC's position that when Norris Asphalt took control of the roadway in March of 2001, it became Norris Asphalt's responsibility to maintain the roadway in a reasonably safe manner, including the shoulders. In the Contract and Bond signed by both Norris Asphalt and [MHTC], Norris Asphalt agreed to comply with the contract provisions laid out in the "Missouri Standard Specifications for Highway Construction, 1999" and "Missouri Standard Plans for Highway Construction." . . .

The Missouri Standard Specifications for Highway Construction, 1999, Sections 107.11 and 107.13.2.3 govern Norris Asphalt's responsibility for claims for damage and injury, and the insurance coverage required for such claims. . . . Under said sections, Norrish Asphalt is required to indemnify and save harmless the State of Missouri, the Commission, its agents, and employees from all claims or suits made or brought for personal injury, death or property damage, caused or contributed to be caused by the creation or maintenance of a dangerous condition of or on the Commission's property or right of way, which condition at least occurred in part due to the acts or omissions of the contractor, subcontractors or suppliers. Norrish Asphalt was in possession and control of the roadway at issue in this lawsuit and, therefore, was responsible for any maintenance or repairs of such roadway. Further, Norris Asphalt was required to name the State of Missouri, the Highway Commission, its agents, members, and employees as additional insureds under its commercial general liability policy.

Lastly, Section 105.13 of the Missouri Standard Specifica-tions for Highway Construction . . . states that maintenance shall be prosecuted so that roadway structures are kept in satisfactory condition at all times. Due to these provisions, we are again demanding indemnification and tendering MHTC's defense of this matter to Norris Asphalt.

Doc. 126-8 at 2-3.  On December 12, 2006, counsel for MHTC sent a follow-up letter to Roper regarding the tender, as MHTC still had not received any response.  Doc. 126-8 at 15.

On February 26, 2007, MHTC's counsel sent a letter directly to Cincinnati, addressed "To Whom it May Concern," demanding a defense in the Clay County action.  Doc. 126-9 at 1.  This letter referenced and enclosed the letters that had been sent to Norris and Roper on May 5, 2004, May 12, 2004, October 4, 2006, and December 12, 2006, as well as the petitions filed in the underlying suit.  Doc. 126-9 at 1-2.  This letter reiterated MHTC's position that the portion of I-29 where the accident occurred "was under construction pursuant to a contract issued by MHTC to [Cincinnati's] insured, Norris Asphalt," and  "clearly under the control of" Norris when the accident occurred.  Doc. 126-9 at 1.

In a letter from Cincinnati to MHTC dated July 21, 2007, Cincinnati stated that it was "continuing to deny MHTC's tender," but that it "would like to request some documents . . . in order to consider the tender demand further."  Doc. 126-10.  In particular, Cincinnati requested "the complete construction schedule that was approved by MHTC as well as the full daily work records."  Doc. 126-10.  Cincinnati promised to respond to the tender upon receipt of these documents.  Doc. 126-10.

Counsel for MHTC enclosed these materials with a letter to Cincinnati dated September 21, 2007.  *See* Doc. 126-12.  This letter further stated that "both items requested have been produced through discovery to your insured through their counsel."  Doc. 126-12 at 1.  At this time, MHTC's counsel described MHTC's position as follows:

> MHTC's [*sic*] is entitled to a complete defense and
> indemnification pursuant to the contract regardless of the
> what [*sic*] work was or had been performed at the time of the
> accident. However, a review of the construction schedule and
> daily logs further bolsters MHTC's position as Norris Asphalt
> is unable to claim that work had not been performed at or
> near the area of the accident. You will note that Boone
> Construction, a subcontractor retained by Norris Asphalt, was
> completing patch work in the area of the accident at or near
> the time of the accident. There is no question that Norris
> Asphalt was in control of the roadway at the time of this
> accident.

Doc. 126-12 at 1.

In a letter to MHTC's counsel dated April 5, 2012, Cincinnati provided the

following explanation for its ultimate refusal to provide MHTC a defense:

> The Policy does not provide coverage for MHTC for this
> claim. You note that the contract between Norris Asphalt and
> MHTC required Norris Asphalt to name MHTC as an
> additional insured on its liability insurance policy. . . .
> However, an exclusion to the additional insured endorsement
> applies to the underlying action giving rise to your tender.
>
> Our initial investigation, as well as the facts developed in the
> underlying action, revealed that Norris Asphalt had not begun
> work on the portion of the highway at issue in the underlying
> lawsuit when the accident giving rise to the underlying case
> occurred. Thus, the relevant portion of the highway was not
> under Norris Asphalt's control and it had done no work on the
> portion of the roadway where the accident occurred. Further,
> Norris Asphalt was not required to begin work on the relevant
> portion of the highway, nor was it required to provide any
> resurfacing work on any portion of the highway, prior to the
> date of the accident under its approved schedule with MHTC.
> Any negligence in failing to properly construct or maintain
> the relevant portions of the roadway at the time of the
> accident, as well as any failure to properly inspect the
> roadway, warn the public of the roadway's condition, and
> repair any dangerous conditions of the roadway, was solely
> on the part of MHTC, and not Norris Asphalt. As such, even

though MHTC might qualify as an additional insured under Norris Asphalt's policy, the "sole negligence" exclusion to the additional insured endorsement cited above would apply, barring coverage.

As you know, Norris Asphalt was hired to do the paving work on the Interstate 29 project, and it had not yet begun any of that work at the time of the accident giving rise to the underlying suit. Norris Asphalt first began doing work on August 6, 2001, almost two months after the loss. As such, Norris Asphalt had exercised no control over the area of the highway where the accident occurred, nor was it expected or required to do so under its contract with MHTC.

You point out that one of Norris Asphalt's subcontractors, Boone Construction Co., had performed some patching work near the accident site prior to the date of loss. Nonetheless, our investigation has revealed that all of the pavement repair work done by Boone Construction Co. prior to the date of the loss was done on bridges—not as part of the main pavement project. According to the schedule, the bridge work was not to be completed until at least 13 days after the date of the loss. Simply put, Boone Construction Co. had done no patching work that would have caused or contributed to the alleged defect in the roadway that caused the accident giving rise to the underlying suit. If there was a defect in the highway, it was caused solely by MHTC's failure to maintain the roadway. . . .

The facts surrounding this lawsuit clearly show that Norris Asphalt and its subcontractors had done no work that could have caused or contributed to the alleged defect in the highway, and they were not required to begin doing any patching or paving work to the portion of the roadway where the accident occurred under their contract with MHTC until well after the date of the accident. Again, because MHTC was solely responsible for any defects in the highway that gave rise to this accident, the sole negligence exclusion cited above applies and MHTC is owed no coverage under the Policy.

Doc. 126-11 at 5-6.  Cincinnati also expressly reserved its right to disclaim coverage based on "any other policy provision, term, condition, or exclusion in the policies," as well as "any applicable law," or "the facts as they are developed in the underlying litigation."  Doc. 126-11 at 6.

**C.  Resolution of the Clay County Suit and Cincinnati's Declaratory Judgment Action**

After Cincinnati denied MHTC's tender for a defense, the plaintiffs in the Clay County suit and MHTC entered into an agreement pursuant to Mo. Rev. Stat. § 537.065.  *See* Doc. 126-27.  This agreement included a recitation of facts regarding Norris' contract with MHTC, the insurance policy issued by Cincinnati, the subject accident, Norris' work on I-29, and Cincinnati's denial of MHTC's tender.  Doc. 126-27 at 1-2.  In particular, the agreement stipulated that Norris had begun performing construction on and was in control of the relevant portion of  I-29 when the accident occurred.  Doc. 126-27 at 1. The agreement further stated that the plaintiffs and MHTC believed that the insurance policy issued by Cincinnati provided coverage for the claims asserted against MHTC and that Cincinnati had wrongfully refused to defend and indemnify MHTC. Doc. 126-27 at 2.

As a result of Cincinnati's denial of MHTC's tender, MHTC executed this agreement to limit its "exposure as to the payment of damages on Plaintiffs' clams only to that amount payable under the Cincinnati Insurance Company policy and other limited assets of MHTC."  Doc. 126-27 at 2.  In return, MHTC agreed "to an award to be either entered by the Arbitration Panel or as a Judgment by the Circuit Court of Clay County in favor of Plaintiffs and against MHTC," in specified amounts.  Doc. 126-27 at 2-3.  The

plaintiffs further expressly reserved their right to continue pursuing their claims against Norris for damages in excess of the amounts stipulated to in this agreement. Doc. 126-27 at 3. In addition, MHTC assigned to the plaintiffs any and all claims that MHTC might have against Cincinnati and agreed to continue to pursue its cross-claims against Norris, although the plaintiffs' counsel would represent MHTC in prosecuting these claims. Doc. 126-27 at 3-4.

On December 19, 2012, the trial court in the Clay County suit held an evidentiary hearing regarding the section 537.065 agreement, MHTC's liability, and the extent of the plaintiffs' damages. Doc. 126-33 at 2. At this hearing, the plaintiffs presented their evidence and rested, while MHTC presented no evidence and rested. Doc. 126-33 at 2. The plaintiffs' evidence included deposition testimony of witnesses, expert witnesses, members of the Missouri Highway Patrol, and some of the plaintiffs, as well as various documents. Doc. 126-33 at 2-3. Norris was notified of the hearing and its counsel was present, but Norris was excluded from participating in the hearing on the plaintiffs' motion. Docs. 126-29; 126-30; 126-33 at 2.

The resulting judgment, entered on December 21, 2012, set forth a number of findings of fact and conclusions of law. In particular, the court found that the location of the accident "was in a dangerous and defective condition and causally linked to the rollover," that MHTC was liable to the plaintiffs under Mo. Rev. Stat. § 537.600, and that the settlement amounts were reasonable. Doc. 126-33 at 5-6. In addition, the court made the following factual findings regarding Norris:

> At the time of the rollover, the Defendant MHTC had entered into a construction contract . . . with the Defendant Norris Asphalt for the purpose of repair and resurfacing of I-29, including repair and resurfacing of the subject shoulder at the location of this rollover. This included repair, reconstruction and resurfacing of not only the roadway, but the subject shoulder area. . . . Within 10-11 days prior to the subject rollover, the specific area of the rollover had been turned over to the control of Norris Asphalt and its subcontractors. During that period of time, repairs and reconstruction had in fact taken place on the inside lane at the specific location of the rollover. Various signs were in place regarding the construction project. They had been placed there by Defendant Norris' subcontractor Tri-State Signing. Additional signs were made available by MHTC to alert drivers with regard to the construction project.

Doc. 126-33 at 4-5. The court expressly did not, however, make any findings regarding Norris' liability to the plaintiffs, as these claims had been referred to a pending arbitration. Doc. 126-33 at 7.

Cincinnati initiated this action for declaratory judgment on December 21, 2012 and filed its First Amended Complaint on January 2, 2013. Around this same time, the plaintiffs in the Clay County suit filed a series of garnishment actions against Cincinnati in Missouri state court. Cincinnati removed each of the garnishment cases, which were later consolidated with the present action for declaratory judgment.

On June 6, 2013, the Clay County plaintiffs filed their second amended petition, on which their claims against Norris proceeded to arbitration. Doc. 126-35 at 1. In addition to the allegations in the first amended petitions, this petition alleged that:

> 12. Per the terms of the contract, Defendant Norris took possession and control of the construction area of I-29, including the area where the subject rollover took place and did so at least by January 8, 2001, the Notice to Proceed date.

. . . Defendant Norris had taken active control and possession of such roadway and had in fact begun work on the 7.1 mile construction area within 10 to 11 days before the subject rollover. By actions of its subcontractor, Tri-State Signs, Norris erected construction zone and traffic control signs as early as March 15, 2001. Norris had also taken active possession and control of the construction zone, and specifically the area of the rollover, 10 to 11 days before the rollover by beginning construction work at the site and location of the subject rollover. Such construction included joint repairs and shoulder stabilization. By their actions, Defendant Norris had taken full possession of the roadway well before the subject rollover took place, had erected construction zone signage and had in fact begun pavement and shoulder repairs at the site of the rollover. At all times relevant to this case, Defendant Norris had fully accepted its duties and responsibilities under its contract with MHTC to maintain the roadway and to manage the traffic of the subject I-29 roadway within the construction zone, which included defects and drop offs from the driving lane to the shoulder, whether they existed at the time that they took possession or were created by the actions of the Defendant Norris. Such duties and responsibilities began well before the June 24, 2001 rollover date.

***

14. Approximately 10 to 11 days before the subject rollover occurred, the Defendant Norris, through its own actions and the actions of its subcontractors, closed the northbound inside (passing) lane and directed traffic over onto the right lane and the right shoulder. During such period of time Norris performed repair work to the inside lane and the inside shoulder . . . . The possession of the roadway by Norris, as well as the joint repairs and the inside shoulder stabilization described above, were performed and took place well before the rollover.

15. As a direct and proximate result of the actions of Norris described above and herein, traffic, including 12,000 vehicles per day, of which 5,000 were large semi rucks, were directed over onto the right shoulder at or near the location of the rollover resulting in the deterioration of the shoulder area

where the Defendant Chow lost control of his vehicle resulting in the subject rollover.

16. I-29 at the location of the subject rollover was rendered into a dangerous and defective condition by the actions of the Defendant Norris as described above and herein and specifically the actions taken by Norris over a short period of time 10 to 11 days prior to the rollover.

17. Defendant MHTC had a non-delegable duty to Plaintiffs to maintain its property. Defendant Norris, by its actions:

   a. Specifically caused the roadway to become dangerous and defective as described above and herein;

   b. Failed to maintain and repair such roadway, including the right shoulder at or near the rollover site;

   c. Failed to barricade the dangerous and defective condition of the roadway from traffic; and

   d. Failed to adequately warn motorists like Chow of the dangerous and defective condition of the roadway.

*\*\**

20. By the actions described herein, the MHTC and the Defendant Norris are jointly and severally liable to the Plaintiffs for their injuries, damages and losses[.]

*\*\**

31. Norris, through its subcontractors, had redirected traffic onto the right hand northbound lane and more so onto the subject shoulder area, which clearly caused and contributed to cause the deterioration of that shoulder area, resulting in the shoulder being deteriorated, further deteriorated resulting in its dangerous and defective condition at the time that Mr. Chow operated his vehicle and lost control on June 24, 2001.

Doc. 126-35 at 4-6, 8.

On November 27, 2013, the panel presiding over the matters referred to arbitration in the Clay County suit entered their final judgment and award. Doc. 126-36 at 1. The panel concluded that both the driver of the vehicle and Norris were "guilty of 0% fault," and entered judgment in favor of the driver and Norris. Doc. 126-36 at 2.

## II.     Discussion

Fundamentally, this case presents a dispute over the interpretation of an insurance policy, which is a question of law. *McCormack Baron Mgmt. Servs., Inc. v. Am. Guarantee & Liab. Ins. Co.*, 989 S.W.2d 168, 171 (Mo. 1999). In interpreting the language of the policy, the Court must "apply the meaning which would be attached by an ordinary person of average understanding if purchasing insurance." *Id.* The insured has the burden of proof with respect to coverage. *Manner v. Schiermeier*, 393 S.W.3d 58, 63 (Mo. 2013). Where the insurer relies on a policy exclusion as a basis for denying coverage, however, "it has the burden of proving that such an exclusion is applicable," and the exclusion clause will be strictly construed against the insurer. *Sexton v. Omaha Prop. & Cas. Ins. Co.*, 231 S.W.3d 844, 848 (Mo. Ct. App. 2007)

Each party moves for summary judgment as to whether Cincinnati:  1) breached its duty to defend MHTC in the Clay County suit; and 2) has a duty to indemnify MHTC for the judgment entered against it in that action. The duty to defend and the duty to indemnify are distinct duties that require separate analysis. Accordingly, each is addressed, in turn, below.

A.    **Duty to Defend**

The Missouri Supreme Court recently reiterated the key characteristics of the duty

to defend, as follows:

> 'The duty to defend is broader than the duty to indemnify. To
> suggest that the insured must prove the insurer's obligation to
> pay before the insurer is required to provide a defense would
> make the duty to defend provision a hollow promise[.] *The
> duty to defend arises when ever there is a potential or
> possible liability* to pay based on the facts at the outset of the
> case and is not dependent on the probable liability to pay
> based on the facts ascertained through trial. The duty to
> defend is determined by comparing the language of the
> insurance policy with the allegations in the complaint. *If the
> complaint merely alleges facts that give rise to a claim
> potentially within the policy's coverage, the insurer has a
> duty to defend.*'

*Columbia Cas. Co. v. HIAR Holding, L.L.C.*, 411 S.W.3d 258, 265 n.10 (Mo. 2013)

(emphasis in original) (quoting *McCormack Baron Mgmt. Servs., Inc.*, 989 S.W.2d at

170-71). As this and other Missouri cases make clear, "the duty to defend is principally

determined by comparing the language of the insurance policy with the allegations in the

underlying original and amended petitions, whether groundless or valid." *Custom

Hardware Eng'g & Consulting, Inc. v. Assurance Co. of Am.*, 295 S.W.3d 557, 561 (Mo.

Ct. App. 2009). "To extricate itself from a duty to defend a suit against the insured, the

insurer must demonstrate that there is no possibility of coverage." *Interstate Bakeries

Corp. v. OneBeacon Ins. Co.*, 686 F.3d 539, 543 (8th Cir. 2012) (quotation omitted).

In this case, the record shows that Cincinnati learned of the Clay County suit and

MHTC's tender for a defense under the subject policy no later than May 14, 2004.

Doc. 126-39 at 21-23, 144-45. Although the original Clay County petition did not

mention Norris by name, it did allege that the State of Missouri and MoDOT were negligent "through the employees and agents of MoDOT," Doc. 126-2 at 5, and Cincinnati knew or should have known that, during the relevant time period, Norris was under contract with MHTC to perform construction work on the portion of I-29 that included the accident site. In any event, the Clay County plaintiffs' amended petitions, filed just one month later, added Norris as a named defendant and asserted specific allegations of negligence against Norris. *See, e.g.*, Doc. 126-4 at 2, 7-8. Cincinnati, which clearly had an interest in this suit by virtue of its named insured being named as a defendant, has not suggested that it did not receive notice of these amended pleadings. Furthermore, the record shows that MHTC did directly provide Cincinnati with notice of the Clay County plaintiffs' claims against Norris. *See* Docs. 126-8 at 1-2; 126-9 at 1-2. Thus, the Clay County plaintiffs' amended petitions are the primary benchmark for determining whether Cincinnati had a duty to defend MHTC. *See, e.g.*, *Stark Liquidation Co. v. Florists' Mut. Ins. Co.*, 243 S.W.3d 385, 398 (Mo. Ct. App. 2007) ("The injured party may add additional claims *en route* to trial and, once the injured party has provided the insurer notice of these claims, the insurer will owe a duty to defend when the new claim potentially or possibly comes within the policy's coverage.").

Cincinnati argues that the allegations in the amended petitions did not give rise to a potentially covered claim because there was no allegation that Norris had done any work in the area of the accident or actually caused the defective condition. Cincinnati maintains that such an allegation was a prerequisite to coverage, because the additional insured endorsement only provided coverage for "liability *arising out of* [Norris']

ongoing operations performed for that additional insured by you or on your behalf."
Doc. 127-37 at 27 (emphasis added). "[U]nder Missouri insurance law, 'arising out of'
has been interpreted 'to be a very broad, general and comprehensive phrase' meaning
'originating from' or 'having its origins in' or 'growing out of' or 'flowing from.'"
*Capitol Indem. Corp. v. 1405 Assocs., Inc.*, 340 F.3d 547, 550 (8th Cir. 2003) (quoting
*Colony Ins. Co. v. Pinewoods Enters., Inc.*, 29 F. Supp. 2d 1079, 1083 (E.D. Mo. 1998)
(collecting cases)). This language is "more expansive than the words 'caused by' used in
some policies," and requires only "a simple causal relationship" between the injury and
the activity of the insured, as opposed to "the strict 'direct and proximate cause' standard
of general tort law." *Colony Ins. Co.*, 29 F. Supp. 2d at 1083; *accord Capitol Indem.
Corp.*, 340 F.3d at 550; *Walton Constr. Co., LLC v. Liberty Mut. Fire Ins. Co.*, No. 09-
0706-CV-W-ODS, 2010 WL 4625734, at *1 (W.D. Mo. Nov. 8, 2010). Accordingly,
Missouri courts have held that but-for causation is "sufficient to satisfy the 'arising out of
language' in policies." *Walton Constr. Co., LLC*, 2010 WL 4625734, at *2.

Considering the broad interpretation given to the language "arising out of" in this
context, the allegations in the Clay County plaintiffs' amended petitions stated a claim for
which there was potentially coverage for MHTC under the relevant policy. In particular,
these petitions alleged that Norris "was negligent in the construction and maintenance of
the aforesaid road," in that it: 1) failed to timely perform the construction and
maintenance delineated in its contract with MHTC; 2) failed to erect signs sufficient to
warn motorists of the dangerous condition of the highway; 3) failed to timely and
adequately repair the unsafe condition; and 4) failed to adequately protect the public from

the unsafe condition by placing signs, limiting access to the shoulder, and limiting usage of the right lane. Docs. 126-4 at 5-8; 126-5 at 6-8. In other words, these petitions alleged that, but for Norris' negligence in the performance of its work for MHTC, largely by omission, the accident would not have occurred. In addition, these petitions alleged that Norris failed to "*adequately* repair the dangerous and defective condition," Docs. 126-4 at 7; 126-5 at 8 (emphasis added), creating the inference that Norris affirmatively made a failed attempt at correcting this danger.

Cincinnati's argument to the contrary seems to conflate the "arising out of language" in the relevant policy with the more stringent "caused by" language found in some policies. Specifically, Cincinnati claims that there could be no possibility of coverage unless Norris or one of its subcontractors had been alleged to have actually "caused the shoulder drop-off." Doc. 126 at 19. Cincinnati has presented no argument or authority, however, suggesting that an accident can never be said to have arisen from a contractor's ongoing operations where the accident was allegedly caused by the contractor's negligent omissions in the performance of its work. In sum, although the Clay County plaintiffs did not specifically allege that Norris created the dangerous condition, they did allege that Norris' negligent acts and omissions were causally connected to the subject accident.

Cincinnati also claims that its independent investigation revealed that there was no causal link between the actions of Norris or its subcontractors and the subject accident. The only evidence of this investigation cited by Cincinnati consists of two letters from its counsel to MHTC, dated July 21, 2007 and April 5, 2012, respectively. *See* Doc. 126 at 5

(citing Doc. 126-10, Plaintiff's Exhibit J, counsel for Cincinnati's July 21, 2007 letter to MHTC; and Doc. 126-11, Plaintiff's Exhibit K, counsel for Cincinnati's April 5, 2012 letter to MHTC). The July 21, 2007 letter did not mention the results of any investigation, but stated, "We are continuing to deny MHTC's tender, however we would like to request some documents from you in order to consider the tender demand further." Doc. 126-10 at 1. The April 5, 2012 letter stated, in relevant part, "Our initial investigation, as well as the facts developed in the underlying action, revealed that Norris Asphalt had not begun work on the portion of the highway at issue in the underlying lawsuit when the accident giving rise to the underlying case occurred." Doc. 126-11 at 5. Cincinnati has otherwise offered no evidence of its independent investigation, such as a claim file or testimony from individuals involved in the investigation, despite being offered every opportunity to do so. *See, e.g.*, Doc. 109 at 10 (denying Defendants' first motion for partial summary judgment because Cincinnati had not yet had the opportunity "to present its facts showing it was justified in refusing to defend.").

Instead, in the same manner that the April 5, 2012 letter referenced "the facts developed in the underlying action," Cincinnati relies primarily on evidence adduced during discovery in the Clay County suit and this case to support its claim that the "actual facts" show no causal connection between Norris' actions and the subject accident. *See* Doc. 126 at 5-6 (citing, *inter alia*, Doc. 126-17, Plaintiff's Exhibit Q, deposition taken in this case and the Clay County suit; Doc. 126-18, Plaintiff's Exhibit R, deposition taken in this case and the Clay County suit; Doc. 126-19, Plaintiff's Exhibit S, deposition taken in the Clay County suit; Doc. 126-20, Plaintiff's Exhibit T, Engineer's report regarding

the subject accident, dated June 14, 2007; Doc. 126-21, Plaintiff's Exhibit U, deposition taken in the Clay County suit; Doc. 126-22, Plaintiff's Exhibit V, deposition taken in the Clay County suit; Doc. 126-23, Plaintiff's Exhibit W, deposition taken in the Clay County suit; Doc. 126-24, Plaintiff's Exhibit X, deposition taken in the Clay County suit; Doc. 126-25, Plaintiff's Exhibit Y, Contractor Performance Report regarding Job No. J1I0733; and Doc. 126-40, Plaintiff's Exhibit NN, deposition taken in this case and the Clay County suit).

This evidence has no bearing on the duty to defend, which is determined based on the pleadings and actual facts known or ascertainable at the time the action is commenced, not from what discovery or a trial of the case may ultimately show the true facts to be. *See Interstate Bakeries Corp.*, 686 F.3d at 542; *see also Stark Liquidation Co.*, 243 S.W.3d at 398 ("While Florists appears to define 'actual facts' to mean proven facts, the law does not support such a distinction. Actual facts are those facts which were known, or reasonably should have been apparent at the commencement of the suit and not the proof made therein or the final result reached.") (quotation omitted). Accordingly, in determining whether Cincinnati breached its duty to defend, the Court must ignore Cincinnati's "reliance on facts that emerged during discovery." *Esicorp, Inc. v. Liberty Mut. Ins. Co.*, 193 F.3d 966, 969 (8th Cir. 1999).

Nonetheless, the record does permit the inference that Cincinnati's investigation included a review of the construction schedule for Job No. J1I0733 and the daily work records from this project, which Cincinnati requested from MHTC on July 21, 2007 and received on September 21, 2007. *See* Docs. 126-10; 126-12. A review of the daily work

records would have revealed, as Cincinnati concedes, that Norris' subcontractors had performed saw cuts and concrete pouring on a section of the passing lane of northbound I-29 in the vicinity of the accident site. *See, e.g.*, Docs. 3 at 5; 126-17 at 78-80, 82-83, 97-98; 127 at 9-11. Cincinnati maintains, however, that this is irrelevant because it was clear from these records that no work had been done on the driving lane or shoulder where the unsafe condition was actually located.

This argument rests on the dubious proposition, however, that the daily work records and construction schedule, standing alone, proved this point to an absolute certainty and were reviewed by Cincinnati before denial of coverage. *See Interstate Bakeries Corp.*, 686 F.3d at 543 ("To extricate itself from a duty to defend a suit against the insured, the insurer must demonstrate that there is *no possibility* of coverage." (quotation omitted) (emphasis added)). There could have been any number of potential inaccuracies or omissions in the daily construction logs, and there could have been no guarantee that construction proceeded exactly in accordance with the original schedule.

Perhaps more significantly, further investigation would have revealed, as common sense suggests, that the work performed on the passing lane required that lane to be closed and traffic to be rerouted to the driving lane, with the possibility of driving on the shoulder. *See, e.g.*, Doc. 126-17 at 80, 82-83. Similarly, a review of Norris' contract with MHTC would have revealed that Norris was responsible for controlling traffic for the duration of the project, which included "keeping at least one lane of pavement and the adjacent shoulder open to traffic at all times during construction." Doc. 126-3 at 37. Notably, Norris' contract with MHTC further cautioned, "Incidental damage to the

existing shoulders may also occur due to vehicular traffic using the shoulder to avoid the construction area during lane closure operations such as pavement repair and resurfacing." Doc. 126-3 at 122.  Although Cincinnati argues that shoulder repair work was not scheduled to begin until August of 2001, Norris' contract with MHTC provided, "The sequence of construction may be altered if the contractor finds it necessary to do so." Doc. 126-3 at 40.  Furthermore, under Missouri law, "the fact that a contractor performed the construction work in compliance with MHTC plans and specifications does not serve to insulate the contractor from liability in negligence." *Harlan v. APAC-Missouri Inc.*, 360 S.W.3d 826, 829 (Mo. Ct. App. 2011).

In sum, rather than proving that there was no possibility of coverage, the uncontroverted evidence shows that the facts known to and reasonably ascertainable by Cincinnati at the time it denied MHTC's tender actually revealed a potential, causal connection between Norris' operations and the creation of the allegedly dangerous defect. Specifically, the rerouting of traffic attendant to the work on the passing lane might have caused or contributed to the deterioration of the shoulder.  Even assuming, as Cincinnati claims and Defendants deny, that discovery in the Clay County suit ultimately showed that the defective condition of the shoulder predated any activity by Norris, *e.g.*, Docs. 126 at 6, and 134 at 21, Cincinnati has offered no evidence that suggests this fact was known or ascertainable at the time the suit was commenced.  The record simply does not support the proposition that the facts known or ascertainable at the commencement of the suit showed that there was no possibility that the operations of Norris or its subcontractors caused or contributed to the creation of the allegedly defective condition.

Furthermore, the Clay County plaintiffs plainly did not allege that the accident arose from the sole negligence of MHTC, *see* Docs. 126-4 at 7-8, and 126-5 at 7-8, and Cincinnati has failed to present any evidence that its investigation prior to its denial of a defense proved that the accident was caused by the sole negligence of MHTC.

Cincinnati also suggests that it had no duty to defend MHTC because of the existence of an inherent conflict of interest between MHTC and Cincinnati. For support, Cincinnati relies on *James v. Paul*, 49 S.W.3d 678 (Mo. 2001) and *Cox v. Steck*, 992 S.W.2d 221 (Mo. Ct. App. 1999). As later decisions have recognized, however, the *James* court held only that, based on the unusual circumstances of that case including the conflict of interest between the insurer and insured, "'it would be inequitable for [the insurer] to be collaterally estopped *from asserting its coverage defenses* in [a] garnishment proceeding.'" *Stark Liquidation Co.*, 243 S.W.3d at 399-400 (quoting *James*, 49 S.W.3d at 688) (emphasis in original). The *Cox* court reached the same conclusion where the insurer "did not have a full and fair opportunity to litigate the issue of liability in the underlying action." *Cox*, 992 S.W.2d at 224.

By contrast, where an insurer had the opportunity to participate in the defense of the underlying case and is permitted to assert its coverage defenses in a later action to collect under the subject policy, *James*, and for the same reasons *Cox*, do not apply. *Stark Liquidation Co.*, 243 S.W.3d at 400. There is no question that Cincinnati had the opportunity to participate in the defense of the Clay County suit. Furthermore, Cincinnati has not been estopped from presenting evidence and argument here as to why it had no duty to defend. Consequently, *James* and *Cox* do not apply and the alleged conflict of

interest between MHTC and Cincinnati does not affect Cincinnati's duty to defend the potentially covered claim against MHTC.

Finally, the bulk of Cincinnati's argument is devoted to refuting one of the theories advanced by MHTC as a basis for its tender, namely that, under the contract, Norris assumed responsibility and control over the entire seven-mile stretch of I-29 on the date that the project commenced. Cincinnati has failed, however, to explain how the merit of MHTC's position in this regard is relevant to Cincinnati's duty to defend, which is principally determined by the allegations in the underlying petitions. Cincinnati has cited no authority suggesting that an insurer can refuse to provide a defense where the relevant petition states a potentially covered claim, simply because the insured's tender did not identify the correct theory under which coverage was implicated. Furthermore, such a position, as well as Cincinnati's repeated references to MHTC's purported failure to submit documentation supporting its tender, is contrary to established Missouri law on the duty to defend. *See, e.g.*, *McCormack Baron Mgmt. Servs., Inc.*, 989 S.W.2d at 170-71 ("To suggest that the insured must prove the insurer's obligation to pay before the insurer is required to provide a defense would make [the duty to defend] provision a hollow promise[.] . . . If the complaint merely alleges facts that give rise to a claim potentially within the policy's coverage, the insurer has a duty to defend.").

Considering only the relevant pleadings and actual facts known or ascertainable at the time, the undisputed facts show that the Clay County plaintiffs stated a claim against MHTC that was potentially covered by the relevant policy. Cincinnati thus had a duty to provide a defense, even if Norris' alleged involvement with the accident seemed

improbable or groundless.  *See, e.g.*, *Columbia Cas. Co.*, 411 S.W.3d at 265 n.10 ("*The duty to defend arises when ever there is a potential or possible liability* to pay based on the facts at the outset of the case and is not dependent on the probable liability to pay based on the facts ascertained through trial.") (emphasis in original); *Custom Hardware Eng'g & Consulting, Inc.*, 295 S.W.3d at 561("Whether an insurer has a duty to defend a suit against its insured is principally determined by comparing the language of the insurance policy with the allegations in the underlying original and amended petitions, *whether groundless or valid*.") (emphasis added).

MHTC has presented evidence that it incurred $86,110.33 to defend the underlying state court action and Cincinnati does not deny this.   But MHTC does not present any facts or argument as to why the fees incurred were reasonable and Cincinnati does not admit the reasonableness of the fees incurred by MHTC.  Because the burden of proof for this issue is on MHTC, the Court has an insufficient record to determine whether $86,110.32 is reasonable.  Within 20 days of this order,  MHTC may file any additional evidence and argument as to the reasonableness of the fees incurred and Cincinnati may file a response within ten days after MHTC has filed its evidence and argument.

### B.     Duty to Indemnify

Because Cincinnati refused to provide a defense, MHTC was free to limit its potential liability by entering into the section 537.065 agreement with the Clay County plaintiffs.  *See, e.g.*, *Stark Liquidation Co.*, 243 S.W.3d at 399 ("When an insurer refuses to defend, the insured is free to go its own way, and to make a reasonable settlement or

compromise without losing the right to recover on the policy.").  Furthermore, because

Cincinnati's refusal was unjustified, Cincinnati cannot relitigate relevant findings made

in the underlying state court lawsuit.  *See*, *Columbia Cas. Co.*, 411 S.W.3d at 264-65,

272; *Schmitz v. Great Am. Assur. Co.*, 337 S.W.3d 700, 709-10 (Mo. 2011); *Assurance*

*Co. of Am. v. Secura Ins. Co.*, 384 S.W.3d 224, 232-33 (Mo. Ct. App. 2012).[3]

However, Defendants seem to presume that if Cincinnati breached the duty to

defend, then Cincinnati is necessarily bound to indemnify the Clay County judgment.

*E.g.*, Doc. 138 at 7 ("[O]nce a duty to defend has been established . . . then the duty to

indemnify under those provisions necessarily falls into place under the same set of facts

used to determine the duty to defend.").  While Cincinnati cannot now challenge the

findings made in the Clay County judgment, Cincinnati's duty to indemnify only arises if

the judgment against MHTC is actually covered by Cincinnati's insurance policy.  In

other words, a possibility of coverage is all that is necessary to establish a duty to defend,

but actual coverage is required to establish a duty to indemnify.  *See Fostill Lake*

*Builders, LLC v. Tudor Ins. Co.*, 338 S.W.3d 336, 344 (Mo. Ct. App. 2011) (ruling that

an insurer that refuses to defend will later be bound by a reasonable settlement pursuant

---

[3]        Cincinnati contends there was collusion in the underlying lawsuit. But Cincinnati has not shown that the Clay county plaintiffs colluded with MHTC much less that an independent state court judge participated in any collusion.  Cincinnati points to MHTC's failure to contest the Clay county plaintiffs' evidence, but there is no requirement that MHTC contest evidence presented in the state court action.  Cincinnati had both a duty and opportunity to defend MHTC in that litigation and unjustifiably refused to do so.  Cincinnati cannot now complain that MHTC should have mounted a more vigorous defense.  Further, the findings of the state court all appear to be supported by the record before this Court and Cincinnati has not pointed to any finding by the state court that was not supported by the evidence presented there.  Therefore, the Court finds as a matter of law that Cincinnati is bound by that judgment to the extent it is relevant.

to Mo. Rev. Stat. § 537.065, "*should the insurer's estimation of the lack of coverage turn out to be in error*." (emphasis added)); *see also Am. Econ. Ins. Co. v. Jackson*, 476 F.3d 620, 624 (8th Cir. 2007) ("The duty to indemnify turns on whether the claim is *actually* covered by the Policy.") (emphasis in original). Therefore, the Court returns to Cincinnati's insurance policy to evaluate whether the policy actually covers the judgment entered against MHTC.

Under Cincinnati's policy, Defendants have the burden to prove that MHTC is an additional insured. Cincinnati has the burden to prove any exclusion under the policy. To be an additional insured, MHTC must show that any liability it incurred was "with respect to liability arising out of [Norris'] ongoing operations performed for ... [MHTC] by [Norris] or on [Norris'] behalf...." Doc. 126-37 at 27. To establish its exclusion, Cincinnati must show that MHTC was solely negligent, i.e., Norris was not negligent. Doc. 126-37 at 27.

As for the additional insured requirements, MHTC's primary argument is that once Norris did any work pursuant to its contract with MHTC, Norris was required to eliminate any dangerous conditions that existed on the entire seven mile stretch of highway. MHTC cites to its contract with Norris to support its argument. However, after a careful review of Defendants' citations to the record, the Court has found no provision that defines Norris' obligations so broadly. For example, MHTC cites to §107.11, which provides in relevant part:

> The contractor and surety shall indemnify and save harmless the
> State, the Commission, its agents, employees and assigns from
> all claims or suits made or brought for personal injury, death or
> property damage, caused or contributed to be caused by:
>
> > (a)  The negligence of the contractor, subcontractor,
> > suppliers or their respective officers, agents or
> > employees; [and]
> >
> > (b)  *The creation or maintenance of a dangerous
> > condition of or on the Commission's property or
> > right of way, which condition occurred at least in
> > part due to the acts or omissions of the contractor,*
> > subcontractors, suppliers or their respective
> > officers, agents or employees[.]….

Doc. 126-7 (emphasis added).   This section does not say that Norris is responsible for the

entire seven mile stretch as soon as Norris takes possession of any part of the project.

Rather, Norris is responsible for the maintenance of a dangerous condition "*which*

*condition occurred at least in part due to the acts or omissions of [Norri*s]."  *Id.*

Omission in the legal sense contemplates a duty to act.  Absent a duty to correct

preexisting conditions on the entire roadway at the moment of taking possession, there is

no obligation to indemnify.  At least one court has found such a duty absurd because it

would be impossible for a contractor to meet that duty before being exposed to liability.

*Thirion v. Fredrickson & Watson Constr.,* 193 Cal. App. 2d 299 (Cal. App. 1961).

That said, it appears that contractors in some circumstances have a duty to protect

the public from a dangerous condition,  even if the dangerous condition was not created

by the contractor and even if it is not located on the section of the roadway on which the

contractor is actually working.  For example, in *Breslin v. Fredrickson,* 152 Cal. App. 2d

780,786 (Cal. App. 1957), a California court found a duty to warn or fix a pavement

drop-off even though the contract did not require the contractor to perform any work on

the section of the roadway next to the drop-off. Absent work on the section of the

roadway not covered by the contract, the drop-off could not be effectively fixed. The

California court found a duty to warn or repair existed irrespective of the terms of the

contract, because the contractor owed a duty to the public to keep the roadway safe.

Similarly, Missouri courts have held that a contractor owes a non-delegable duty to the

public to maintain a safe roadway.

> "[H]ighway contractors have a continuing and non-delegable
> duty to exercise reasonable care for the safety of the public
> using the highway." *Swindell v. J.A. Tobin Const. Co.*, 629
> S.W.2d 536, 541 (Mo. App. W.D.1981). "The primary duty to
> exercise reasonable care for the safety of the general public
> using a road or highway during improvements or repair rests
> on the road contractor, and the road contractor in this respect
> must act reasonably and with due regard to the rights of
> persons lawfully using the way and is liable for injuries
> resulting from negligence in the performance of his work."
> *Best v. Fred Weber Const. Co., 525 S.W.2d 102, 108* (Mo.
> App. E.D. 1975). "The liability, aforesaid, is imposed upon
> the road contractor not by virtue of his contract with a public
> authority, or upon failure to perform the work in accord with
> a contract, but upon the tortious breach of duty imposed upon
> the contractor by common law." *Id.* "And the contractor may
> be liable even though he acted without negligence in creating
> the dangerous situation, and this liability exists regardless of
> the requirements of his contract with the highway authorities
> and irrespective of any liability on the part of the
> governmental body employing the contractor." *Joshmer v.
> Fred Weber Contractors, Inc., 294 S.W.2d 576, 583* (Mo.
> App. E.D. 1956); *see also Best,* 525 S.W.2d at 108.

*Harlan v. APAC-Missouri, Inc.,* 360 S.W.3d 826, 829 (Mo. Ct. App. 2011).

*Robinson v. State of Louisiana,* 454 So.2d 257, 262-63 (La. App. 1 Cir. 1984), is

also instructive, although factually distinguishable. In that case, a paving company had

been doing work within 500 feet of a dangerous condition on a shoulder and had

removed a tree within 75 feet of the dangerous condition.  The contractor never worked on the shoulder and had no contract to fix the shoulder.   But during the week preceding the accident, the contractor as part of its contract work diverted traffic onto the shoulder.  Not long after, an accident was caused by the dangerous condition of the shoulder.  The Louisiana court found that diversion of the traffic *may* have exacerbated the hazard of the low shoulder, but at a minimum, the contractor's failure to correct the dangerous condition or warn of its presence, contributed to the accident and the contractor was ultimately found liable for the accident.  Necessarily,  the Louisiana court in *Robinson* found that the contractor owed a duty to the public even though the contractor was not working on the shoulder and shoulder work was not part of its contract with the highway department.  *Also see, Roberts v. Louisiana*, 576 So.2d 85, 88-9 (La. App. 2 Cir. 1991) (contractor's failure to repair edge ruts, of which it was aware, not reasonable).

In essence,  the question for the Court is whether Norris owed a duty to the public to correct or warn of the dangerous condition on the shoulder.   Although it is a close question, the Court believes that a Missouri state court would find such a duty did exist under these circumstances.  Norris, through its agents, was working within a matter of feet of the dangerous condition.  Norris had reason to know that traffic would be diverted onto the shoulder because the passing lane was closed and its contract with MHTC warned Norris that drivers were likely to drive on the shoulder when one lane was closed. The contract also warned of the potential damage that might be caused to the shoulder by the diversion.  Thus, Norris was aware that special care and inspection of the shoulder would be required.  While Norris was not required to make any shoulder repairs until

later, it was required by the contract to ultimately correct the shoulders and the Court cannot say that because of timing under the contract, Norris owed no duty to the public to fix or warn about a dangerous condition in an area it actively worked or at a minimum notify MHTC of the problem. *Harlan* and its antecedent cases make clear that a contractor's obligation to the public does not depend on the requirements of a contract. The fact that Norris had an obligation to fix the shoulders at some later time and the right to divert traffic onto shoulder is evidence it had authority to maintain the shoulder and a duty to the public to correct or warn of dangerous conditions—if it was aware of the dangerous condition or should have been aware of it.[4]

Having found a duty to protect the public under the circumstances of this case, the question remains whether summary judgment should be granted in favor of the Defendants. The Court concludes summary judgment is not appropriate because there is at least one remaining issue of fact for the jury—whether Norris was aware of the dangerous condition or should have been aware of it. While that fact may have been found against MHTC in the Clay County action, it was not resolved as to Norris. The Clay County court only heard evidence "with regard to [] MHTC's liability," and concluded that MHTC was liable to the plaintiffs under Mo. Rev. Stat. § 537.600. Doc. 126-33 at 2, 5-6. The Clay County court made no finding as to whether Norris was negligent in a manner that contributed to cause the accident, and in fact expressly stated

---

[4]  Of course, a duty would also exist if the diversion of traffic by Norris onto the shoulder, exacerbated a preexisting dangerous condition that caused or contributed to cause the accident. However, neither Defendants nor Cincinnati have established as a matter of law that the traffic affected the dangerous ruts on the shoulder.

that its judgment was not an adjudication of the plaintiffs' claims against Norris.  *E.g.*, Doc. 126-33 at 8-9 ("This is only a Judgment on the Plaintiffs' claims against MHTC. . . . This Judgment entry is not an adjudication of the liability claims that Plaintiffs have against Norris[.]").  The Clay County court also expressly did not make any findings as to "MHTC's claim for contribution against Norris."  Doc. 126-33 at 8-9.  Therefore, the state court judgment cannot be relied on to show that Norris had constructive notice or sufficient time to repair or warn.  Closely related is the question of whether MHTC's sole negligence caused the accident.

Because there remains at least one disputed issue of fact, summary judgment is not appropriate for either party on the issue of indemnification.  Cincinnati suggested in oral argument that the arbitration hearing established that Norris was zero percent at fault and that the arbitration showed as a matter of law that Cincinnati was entitled to summary judgment.  However, MHTC was not a party to the arbitration and is not bound by it.  Furthermore, the record does not show what facts and theory of law were presented to the panel.  Finally, the arbitration findings are not admissible in evidence, so cannot be considered for purposes of summary judgment.

## III.     Conclusion

For the foregoing reasons, Cincinnati's motion for summary judgment, Doc. 125, is denied and Defendants' motion for summary judgment, Doc. 113, is granted in part and denied in part.  Within 20 days of this order,  MHTC may file any additional evidence and argument as to the reasonableness of the fees incurred and Cincinnati may file a response within ten days after MHTC has filed its evidence and argument.  As to

the issue of indemnification, there are factual disputes which preclude summary judgment

for either party.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  September 15, 2014
Jefferson City, Missouri